IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

HOUMAN ALLAHVERDI, M.D.,

       Plaintiff,

vs.                                            No. CIV 05-277 JB/DJS

REGENTS OF THE UNIVERSITY OF
NEW MEXICO; UNIVERSITY OF
NEW MEXICO HOSPITAL; DAVID
WILKS, M.D., PAUL ROTH, M.D.,
SALLY BACHOFER,

       Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendants' Motion for Summary Judgment, filed October 31, 2005 (Doc. 36). The Court held a hearing on this motion on December 19, 2005. The primary issue is whether the Defendants gave Plaintiff Houman Allahverdi the due process to which he was entitled when they dismissed him from his medical residency program at the University of New Mexico. Because there is no genuine issue that Allahverdi is a student, and that Allahverdi received all the process to which he was entitled as a student, the Court will grant, in part, the Defendants summary judgment on Allahverdi's procedural due process claim and remand the remaining state claims back to state court.

## FACTUAL BACKGROUND[1]

Plaintiff Dr. Houman Allahverdi began working at the University of New Mexico ("University") as a House Officer[2] in the Family Practice Residency Program on June 21, 2002.  See University of New Mexico School of Medicine Graduate Medical Education Agreement at 1 (executed June 20, 2002)(hereinafter "First Graduate Medical Education Agreement").  At the same time, Allahverdi began a period of study at the University as a post-doctoral fellow.  See id.

Exactly four months after Allahverdi began his residency, Dr. Sally Bachofer, the Director of the Family Practice Residency Program, wrote Allahverdi a letter informing him that the University had placed him on administrative leave because he allegedly made inappropriate and threatening comments while on duty, engaged in inappropriate communications with co-workers, and was untruthful.  See Letter from Dr. Sally Bachofer, Director of the Family Practice Residency Program, to Dr. Houman D. Allahverdi at 1 (signed October 21, 2002)(hereinafter "Bachofer October 21 Letter").  Bachofer requested that Allahverdi undergo a psychiatric evaluation.  See id.  Dr. Joel

---

[1] Local Rule 56.1(b) requires that "[a] memorandum in opposition to the motion must contain a concise statement of the material facts as to which the party contends a genuine issue does exist. Each fact in dispute must be numbered, must refer with particularity to those portions of the record upon which the opposing party relies, and must state the number of the movant's fact that is disputed. All material facts set forth in the statement of the movant will be deemed admitted unless specifically controverted."  Although Allahverdi's Response contains a section labeled "Plaintiffs' [sic] Response to Defendants' Statement of Facts," the numbered facts in that portion of the brief do not correspond to the numbered facts in the Defendants' Motion for Summary Judgment and do not state whether Allahverdi disputes or agrees with the facts outlined in the Defendants' Motion.  Instead of responding to the Defendants' list of undisputed facts, Allahverdi merely lists his own set of facts. For the purposes of this factual section, and all other parts of this Memorandum Opinion and Order, the Court will treat the Defendants' statement of facts as admitted, per Local Rule 56.1(b), unless Allahverdi has stated a fact that contradicts one of the Defendants' enumerated facts.

[2] In the exhibits that the parties have attached to the briefs, the term "House Officer" is spelled in varying ways.  Unless quoted otherwise, the Court will spell it as it appears in the prior sentence.

Yager examined Allahverdi the next day and "found no evidence for serious depression or anxiety syndrome."  Evaluation for Houman Daron Allahverdi, M.D. at 3.  Allahverdi felt "relatively blameless for what has occurred and presents himself as the victim of misunderstandings and circumstances."  Id. at 2.  According to Yager, Allahverdi's "personality defenses rationalize his behavior and minimize his own blame."  Id. at 3.  Allahverdi admitted to Yager that he had a "problem using foul language and that he knows that he shouldn't call people sweetie and shouldn't be using these derogatory words."  Deposition of Dr. Joel Yager at 32:5-8 (hereinafter "Yager Depo.").

A month later, Bachofer told Allahverdi by letter that a Family Practice Residency Competence Committee ("First Family Practice Committee") had decided to fire him based on its review of the following conduct: (i) he "repeatedly" called women, including fellow employees, "bitches," "fucking bitches," and "chicks" in violation of the University's sexual harassment policy and its Code of Professional Conduct; (ii) he threatened those people who complained about his inappropriate language in violation of the University's policy against campus violence; and (iii) he falsified his application for the residency by failing to disclose a prior residency training program in which he had been enrolled but resigned after calling a female African-American patient a "Nigger." Letter from Dr. Sally Bachofer, Director of the Family Practice Residency Program, to Dr. Houman D. Allahverdi at 1-2 (signed November 22, 2002)(hereinafter "Bachofer November 22 Letter"). Bachofer, Dr. Teresita McCarty, and Dr. Arthur Kaufman comprised the First Family Practice Committee.  See id. at 1.  The First Family Practice Committee considered evidence from University staff, Allahverdi's rotation evaluations, University faculty supervisors, his prior undisclosed residency program, and Yager's evaluation to determine whether he had violated the University's Regulation

and Benefit Manual ("House Officer's Manual") and the Graduate Medical Education Agreement. See id. Allahverdi acknowledged receipt of the letter by signing it. See id. at 2.

Allahverdi appealed the First Family Practice Committee's decision by filing a grievance with the University's Graduate Medical Education office per the House Officer's Manual. See Deposition of Houman Allahverdi at 121:13-122:2 (hereinafter "Allahverdi Depo."). The Graduate Medical Education Grievance Committee ("First GME Committee") met on December 16, 2002, to hear Allahverdi's appeal. See Cover Sheet for Graduate Medical Education Grievance Committee for Houman D. Allahverdi, MD at 1. Dr. Terese O'Brien, Dr. Warren Heffron, and Dr. Mike Marnick sat on the First GME Committee. See Transcript of December 16, 2002 Grievance Hearing at 1. The following people also attended the December 16 hearing: Dr. David Wilks, the Interim Associate Dean for Graduate Medical Education; Joe Sparkman, Program Director of the University's Graduate Medical Education Program; Allahverdi; Robert Gorance, Allahverdi's counsel; Elizabeth Staley, the University's counsel; and Bachofer. See id. at 1. During the hearing, Allahverdi asked "for reinstatement for the remaining eight months, alongside with probation." Id. at 9. Allahverdi stated: "I also understand that the zero tolerance for inappropriate behavior will be instituted for this." Id.

The First GME Committee concluded that the First Family Practice Committee had "just cause" to terminate him for the reasons outlined in Bachofer's November 22 letter, but that he should be reinstated subject to seven conditions. Letter from Dr. David H. Wilks, Interim Associate Dean for Graduate Medical Education, to Dr. Houman Allahverdi at 1 (signed December 17, 2002). Two of those conditions required: (i) "You [Allahverdi] will be placed on probation by the Department of Family Medicine for the remainder of your first year of training. There will be zero tolerance for any behavioral difficulties. If you exhibit behavior that is inconsistent with professional behavior, you will

be immediately dismissed from the program."; and (ii) "In the event you are dismissed from the

educational program for behavioral reasons, you will agree not to contest the action and there will

be no grievance, appeals or legal process available to you."  Id. at 1-2.  Allahverdi indicated his

acceptance of these conditions by signing the First GME Committee's letter to him.  See id. at 2.

Also, in a letter from Gorence to Sparkman, Allahverdi's attorney represented that "Dr. Allahverdi

enthusiastically accepts all of the terms and requirements imposed by the grievance committee in lieu

of his proposed discharge."  Letter from Robert J. Gorence to Joe Sparkman, Program Director,

Graduate Medical Education, University of New Mexico, at 1 (dated December 17, 2002).

Two months later, Bachofer sent Allahverdi a letter that explained the First GME

Committee's decision and the conditions it imposed for his probationary reinstatement as an intern

in the Department of Family Medicine.  See Letter from Dr. Sally Bachofer, Director of the Family

Practice Residency Program, to Dr. Houman D. Allahverdi at 1 (dated February 20, 2003)(hereinafter

"Bachofer February 20 Letter").  One condition was that he would remain on "[p]robationary status

for the reminder of the first year of training."  Id. at 2.  Another condition was:

> Zero tolerance policy for unacceptable behavior or language
>
> a.      During any residency related activities, the use of any language identified as
> inappropriate, including but not limited to "sweetie," "honey," "bitch," "fucking,"
> "nigger," "I love you," etc., will be cause for immediate dismissal without recourse.
> This list is not limited to the terms listed and shall include all slang or otherwise
> inappropriate terms referring to race, gender, national origin, disability, religion,
> sexual orientation or other category.
>
> b.      Any behaviors deemed to be inconsistent with professional conduct in any
> setting related to residency activities will be cause for immediate dismissal without
> recourse.

Id.  Bachofer explained that "[a]ll actions and proceedings will be in compliance with 'Houseofficers

-5-

and the University: Regulation and Benefit Manual 2002-2003.'" Id. at 4.

Allahverdi acknowledged receipt of this letter and his agreement with its contents by signing it. See id. Allahverdi was reinstated in February 2003 and resumed his duties in March 2003. See Allahverdi Depo. at 150:4-14.

On March 5, 2003, Allahverdi and the University executed a new agreement. See University of New Mexico School of Medicine Graduate Medical Education Agreement at 1 (executed March 5, 2003)(hereinafter "Second Graduate Medical Education Agreement"). Paragraph F of the Second Graduate Medical Education Agreement provided that, "[i]f the University imposes academic sanctions or takes disciplinary action against the House Officer in his/her capacity as a student, such action will be taken in accordance with the established rules of the University, the School of Medicine and the applicable clinical department covering such matters." Id. at 2. Paragraph G stated that the procedure for grievances would be the one "[c]ontained in the GME Regulation and Benefit Manual." Id. Allahverdi represents that he "understood from this language that [he] still maintained [his] rights under the University Rules and Regulations, including the right to grieve an unfounded termination." Unsworn Declaration of Houman Allahverdi, MD Under Penalty of Perjury in Opposition to Defendants' Motion for Summary Judgment ¶ 13, at 3 (executed November 21, 2005)(hereinafter "Allahverdi Decl.").

The Second Graduate Medical Education Agreement also outlined the following as Allahverdi's responsibilities under the contract:

B.     **RESPONSIBILITIES**. The House Officer shall:

1.     Services:  Act in accordance with the standards of the ACGME and JCAHO as housestaff physician for patients at the hospital to be selected by hospital physicians.  Either the Program Director or a patient's attending physician may

delineate the degree of responsibility expected of each House Officer for each patient. House Officers will perform other duties as directed from time to time by the Program Director and/or attending physician.

        2.    <u>Educational Activities:</u>  Actively participate in the teaching programs and educational activities for his/her individual educational advancement, under the guidance and direction of the Program Director and Chief of the Service to which assigned.  Educational activities include but are not limited to Houseofficer Orientation, seminars, conferences, and committee participation.  Through these activities the Houseofficer is expected to achieve competency in the following areas: patient care, medical knowledge, practice based learning and improvement, interpersonal and communication skills, professionalism, and system-based practice.

        3.    <u>Other Responsibilities:</u>  Included in the GME Regulation and Benefit Manual.

Second Graduate Medical Education Agreement at 1.

        Bachofer informed Allahverdi by letter on March 27, 2003, that the University had placed him on administrative leave once again while it investigated allegations of misconduct.  <u>See</u> Letter from Dr. Sally Bachofer, Director of the Family Practice Residency Program, to Dr. Houman D. Allahverdi at 1 (dated March 27, 2003)(hereinafter "Bachofer March 27 Letter").  Bachofer asserted that the "alleged misconduct, if true, would constitute violation of your current probationary status in the UNM FP Residency Program."  <u>Id.</u>  The letter did not disclose the nature of the allegations or the identities of the complainants.  <u>See id.</u>

        The Second Family Practice Committee met on April 15, 2003, and decided to dismiss him from the Program because he allegedly violated his probation.  Letter from Dr. Sally Bachofer, Director of the Family Practice Residency Program, to Dr. Houman D. Allahverdi at 2 (dated April 15, 2003)(hereinafter "Bachofer April 15 Letter").  The Second Family Practice Committee based its decision on the following accusations: (i) he used the words "fucking" and "ass" regarding a University social worker in violation of the House Officer's Manual's requirement that "House staff

will relate to peers, teachers, students and other care givers in a spirit of collaboration and mutual respect" and the probationary term for zero tolerance of "unacceptable language"; (ii) he failed "to complete accurate and timely check out at the end of a duty period.  [He was] noted on March 24, 2003 and on at least one other occasion, to not check out or not check out completely or in a timely fashion with the covering team"; (iii) he made misrepresentations while explaining his failure to accurately and timely check out in violation of the House Officer's Manual's requirement that "[e]ach Houseofficer is expected to maintain the highest standards of honesty and integrity in professional matters"; and (iv) his inability "to satisfactorily perform all duties of first year house officers in Family Practice" because he demonstrated "an inadequate medical knowledge base and clinical skills significantly below that necessary to function at a minimally acceptable level, . . . [including] not knowing to ask about cardiac risk factors in a patient with chest pain, not knowing basic parameters of urine protein in nephrotic syndrome, and not recognizing that one of [his] patients had a foley catheter placed."  Id. at 1-2.  Bachofer's letter concluded by saying that Allahverdi had "the right to appeal this decision pursuant to the Grievance Procedure provided in the Houseofficers Handbook." Id. at 2.  The Defendants did not allow Allahverdi to participate in the Second Family Practice Committee's review of his case, although the Defendants contend that the House Officer's Manual did not require his participation.  See Defendant's Response to Plaintiff's Request for Admissions at 2-3.

The Second Family Practice Committee reaffirmed its decision on May 7, 2003.  See Letter from Dr. Martha Cole McGrew, Associate Professor, Family and Community Medicine and Office of Undergraduate Medical Education, University of New Mexico School of Medicine, to Dr. David Wilks, Interim Associate Dean, Graduate Medical Education, University of New Mexico School of

Medicine, at 1 (dated May 9, 2003)(hereinafter "McGrew Letter").  Also, the Defendants did not provide Allahverdi with any statements made against Allahverdi before the Second Family Practice Committee met on May 7.  <u>See</u> Defendant's Response to Plaintiff's Request for Admissions at 4.

The University did not give Allahverdi a time frame within which to correct any perceived deficiency, <u>see</u> Defendant's Response to Plaintiff's Request for Admissions at 4, which Allahverdi asserts violated the House Officer's Manual's requirement that, "[i]n the event that academic deficiency is noted, the House officer will be informed.  Written recommendations will be made identifying the measures to be taken in order to correct the deficiency.  A time frame will be given within which correction is to be made."  Plaintiff's Response to Defendants' Motion for Summary Judgment ("Plaintiff's Response") at 6, filed November 23, 2005 (Doc. 38).  <u>See also</u> Defendants' Regents of the University of New Mexico; University of New Mexico Health Sciences Center, David Wilks, M.D., Paul Roth M.D., Sally Bachofer M.D., Answer to Plaintiff's Complaint for Injunctive Relief, for Breach of Contract, and for Violation of Due Process ¶ 14, at 3, filed March 29, 2005 (Doc. 3).  The Defendants state that "a set time frame was not required under the proposed discipline guidelines against [Allahverdi]."  Plaintiff's Response at 6.

Allahverdi appealed his dismissal by filing a new grievance with the University's Graduate Medical Education office.  <u>See</u> Letter from Dr. Houman Allahverdi to University of New Mexico Graduate Medical Education at 1 (dated April 24, 2005).  He explained that the allegations made against him were unwarranted and unfounded.  <u>See id.</u>  Allahverdi requested that Dr. Wilks provide him with "all records or personnel documentation made against" him, including "statement(s) made against [him] for using inappropriate language."  Letter from Dr. Houman Allahverdi to Dr. David Wilks, Interim Associate Dean, Graduate Medical Education, University of New Mexico School of

Medicine, at 1 (dated April 30, 2003)(hereinafter "Allahverdi April 30 Letter").

On May 29, 2003, Allahverdi wrote again to Wilks, informing him that two weeks had passed since the twenty-one day deadline for the Grievance Committee to decide his appeal had elapsed. <u>See</u> Letter from Dr. Houman Allahverdi to Dr. David Wilks, Interim Associate Dean, Graduate Medical Education, University of New Mexico School of Medicine, at 1 (dated May 29, 2003)("Allahverdi May 29 Letter"). Wilks responded on June 3, 2003, stating that the Second Family Practice Committee had reaffirmed its decision to dismiss Allahverdi and that he could arrange an appointment with Bachofer to review "selected documentation" in his file. Letter from Dr. David Wilks, Interim Associate Dean, Graduate Medical Education, University of New Mexico School of Medicine, at 1 (dated June 3, 2003)(hereinafter "Wilks June 3 Letter"). Wilks also wrote: "If you wish to further grieve or appeal this issue, please submit a grievance letter to myself at the Office of Graduate Medical Education within 5 days of receipt of this letter. In your letter requesting further appeal specify the issues that you wish to be considered. I would then submit your letter to Dr. Paul Roth, the Dean of the School of Medicine, for his consideration." <u>Id.</u>

Allahverdi delivered his grievance appeal to Roth on June 6, 2003. <u>See</u> Letter from Dr. Houman Allahverdi to Dr. Paul Roth, Dean of the School of Medicine, at 1 (dated June 6, 2003)(hereinafter "Allahverdi June 6 Letter"). On at least two separate occasions, Allahverdi asked for documents regarding his dismissal to prepare his defense. <u>See</u> Letter from Dr. Houman Allahverdi to Joe Sparkman, Program Director of the University's Graduate Medical Education Program, at 1 (dated June 9, 2003)(hereinafter "Allahverdi June 9 Letter"); Letter from Dr. Houman Allahverdi to Dr. John A. Trotter, Vice Dean and Professor of Cell Biology and Physiology, UNM School of Medicine, at 1 (dated July 7, 2003)(hereinafter "Allahverdi July 7, 2003 Letter").

Twice during the summer of 2003, Allahverdi's lawyer wrote to the University requesting that Allahverdi be allowed to proceed with a Step 1 appeal before a grievance committee rather than a Step 2 proceeding before the Dean of the School of Medicine.  See Letter from Steven Sanders to Dr. John A. Trotter, Vice Dean and Professor of Cell Biology and Physiology, UNM School of Medicine, at 1 (dated July 14, 2003)(hereinafter "Sanders July 14 Letter"); Complaint ¶ 25; Answer ¶ 25.  On August 5, 2003, Ms. Staley, the University's counsel, wrote a letter to Allahverdi's counsel that Dean Trotter would not be available to review Allahverdi's request until Trotter returned from a trip.  See Complaint ¶ 26; Answer ¶ 26.

Ms. Staley informed Allahverdi's counsel by letter that Allahverdi would be allowed to pursue a Step 1 appeal.  She wrote:

> After careful consideration, the School of Medicine has determined that Houman Allahverdi can recommence his appeal of the April decision to dismiss him from the residency program in the Department of Family and Community Medicine.  He will be allowed to file a Step 1 grievance despite the fact that he had knowingly waived that right with the assistance of an attorney in the first disciplinary proceeding. . . . Dr. Allahverdi's request to meet with Dr. Trotter for a second time regarding his dismissal is denied so that any appeal Dr. Allahverdi may choose to file can be conducted in accordance with the procedures specified in the Houseofficer's Handbook.

Letter from Elizabeth Staley, Associate University Counsel, to Steven K. Sanders, Attorney, at 1 (dated September 10, 2003)(hereinafter "Staley September 10 Letter").  In a subsequent letter giving the deadline for filing a Step 1 grievance, Ms. Staley told Mr. Sanders that, "[i]f Dr. Allahverdi chooses to file a grievance, it will be conducted in accordance with the procedures specified in the Houseofficer's Handbook."  Letter from Elizabeth Staley, Associate University Counsel, to Steven K. Sanders, Attorney, at 1 (dated October 7, 2003)(hereinafter "Staley October 7 Letter").  Announcing that Allahverdi's Step 1 hearing would be held on November 5, 2003 – later moved to

November 17, 2003 – Ms. Staley stated that "[t]he hearing will be conducted in accordance with the procedures specified in the Houseofficer's Handbook."   Letter from Elizabeth Staley, Associate University Counsel, to Steven K. Sanders, Attorney, at 1 (dated October 29, 2003)(hereinafter "Staley October 29, 2003").

The Graduate Medical Education Grievance Committee ("Second GME Committee") met on November 17, 2003, to hear Allahverdi's new grievance.  <u>See</u> Deposition of Dr. David Wilks at 48:20-49:4 (hereinafter "Wilks Depo.").  No witnesses were present to give live testimony at the hearing.  <u>See</u> Defendant's Response to Plaintiff's Request for Admissions at 4-5.  The House Officer's Manual does not require such an action.  <u>See</u> House Officer's Manual at 25-26.  Allahverdi was physically present at the hearing and was represented by legal counsel.  <u>See</u> Allahverdi Depo. at 167:9-13.

The rules for the First and Second GME Committee allowed evidence and argument to be submitted in writing, personally, or both.  <u>See</u> House Officer's Manual at 26.  The rules allowed the parties to "employ attorneys or other advisers to assist them in the presentation of the case."  <u>Id.</u> Allahverdi was permitted to make a statement on his own behalf, answer questions from the committee members, and ask questions of the committee members.  <u>See</u> Allahverdi Depo. at 171:19-173:9.  Although permitted to do so, Allahverdi did not present any witnesses to testify before the Second GME Committee.  <u>See id.</u> at 173:21-25.

Allahverdi contends that he objected to the use of unsworn and unsigned letters that were used as evidence against him at the hearing, but the Defendants dispute that he objected to the

introduction of this evidence.[3]  See Plaintiff's Response at 10; Defendants' Reply to Plaintiff's Response in Opposition to Motion for Summary Judgment ("Defendants' Reply") at 3, filed December 9, 2005 (Doc. 41).  Allahverdi also maintains that the Second GME Committee violated the House Officer's Manual by failing to make a recording of the hearing.  See Plaintiff's Response at 10.  The Defendants argue that the applicable provision of the House Officer's Manual – providing that "[t]he committee shall keep a record of the case and may tape record any oral presentation," House Officer's Manual at 26 – does not require that a hearing be recorded and only requires a record of the case, not individual hearings.  See Defendants' Reply at 3.

After the hearing, the Second GME Committee met again to interview University employees about Allahverdi's alleged conduct.  See Letter from Dr. David Wilks, Interim Associate Dean, Graduate Medical Education, University of New Mexico School of Medicine, to Dr. Houman Allahverdi at  1 (dated December 19, 2003)(hereinafter "Wilks December 19 Letter").  The Second GME Committee had already provided those statements to Allahverdi.  See id. at 1. Allahverdi alleges that he was not allowed to cross examine these witnesses, see Plaintiff's Response at 10, a fact which the Defendants dispute, see Defendants' Reply at 3.  The witnesses were not required to swear to their testimony, nor was any witness required to give a sworn affidavit.  See Defendants' Answer to Plaintiff's Second Interrogatories at 3-4.

The Second GME Committee unanimously upheld the decision to dismiss Allahverdi.  See Wilks December 19 Letter at 1.  The Second GME Committee told Allahverdi that he had "the right

---

[3] Allahverdi asserts that the Defendants admitted that he had objected to this evidence in their Response to Allahverdi's Request for Admissions.  See Plaintiff's Response at 10.  The Defendants' Response to the request for admission in question, however, indicated that they neither admitted nor denied that Allahverdi objected because the individuals who could supply this information were unavailable at that time.  See Defendants' Response to Plaintiff's Request for Admissions at 5.

to appeal this decision through the grievance procedure provided on pages 25-27 of the UNM Houseofficers and the University Manual (attached).  You have five days from today to request an appeal."  Id. at 2.

On December 24, 2003, Allahverdi filed a Step 2 appeal with Roth.  See Letter from Donald R. Sears, Jr., to Dr. Paul Roth, Dean of the School of Medicine, at 1 (dated December 24, 2003)(hereinafter "Sears Letter").  On January 23, 2004, Ms. Staley requested a detailed statement of the grounds of Allahverdi's appeal and requested information concerning any "unremedied denial of due process" or new information that was not previously provided to the committee.  Complaint ¶ 40; Answer ¶ 40.  On February 6, 2004, Ms. Staley wrote a letter to Allahverdi's counsel requesting information concerning "unremedied denial of due process" claims and any new information discovered by Allahverdi.  Complaint ¶ 41; Answer ¶ 41.

Allahverdi's counsel wrote to Roth, explaining that Allahverdi was denied due process because the Second GME Committee spoke to witnesses outside of Allahverdi's presence and without granting him the right to cross examine those witnesses.  See Letter from Steven Sanders to Dr. Paul Roth, Dean of the School of Medicine, at 1 (dated February 11, 2004)(hereinafter "Sanders February 11 Letter").  Allahverdi's attorney also expressed concern whether the witnesses' statements were sworn or recorded.  See id.  Allahverdi's counsel requested either a new hearing or Allahverdi's immediate reinstatement.  See id. at 1-2.

On March 12, 2004, Allahverdi underwent a polygraph examination.  See Letter from James L. Wilson, to Steven K. Sanders at 1 (dated March 15, 2004)(hereinafter "Wilson Letter").  The examiner concluded that Allahverdi had been truthful in denying the alleged conduct.  See id. at 2.  Allahverdi provided the results of the polygraph examination to Roth as part of his appeal.  See

Allahverdi Depo. at 177:10-13.

Roth and Allahverdi met on August 2, 2004, to discuss his appeal.  <u>See</u> Letter from Jean M. Bannon, Senior Associate University Counsel, to Steven K. Sanders at 1 (dated July 28, 2004)(hereinafter "Bannon Letter").  Roth thereafter denied Allahverdi's appeal, thus bringing an end to his attempt to overturn the Second Family Practice Committee's decision to terminate him within the University's administrative system.  <u>See</u> Letter from Dr. Paul Roth, Dean of the School of Medicine, to Dr. Houman Allahverdi at 1 (dated September 7, 2004)(hereinafter "Roth September 7 Letter").

## PROCEDURAL BACKGROUND

Allahverdi filed a Complaint against the Defendants in the Second Judicial District Court of New Mexico on January 18, 2005.  <u>See</u> Notice of Removal at 1, filed March 14, 2005 (Doc. 1).  The Defendants removed the case to federal court on March 14, 2005.  <u>See</u> <u>id.</u>  Count I of Allahverdi's Complaint alleges that the individual Defendants violated his due process rights.  <u>See</u> Complaint ¶¶ 54-68, at 12-14.  Allahverdi alleges that the contracts into which he entered with the University and the House Officer's Manual created a property right under the laws of the State of New Mexico, and that he had a reasonable expectation of continued employment at the University.  <u>See</u> <u>id.</u> ¶¶ 57, 60, at 12-13.  According to Allahverdi, the University's termination of him violated his due process rights because there was no good cause to justify his dismissal, he did not have prior notice of the charges, and a neutral judge did not hear his case.  <u>See</u> <u>id.</u> ¶¶ 61-62, at 13.  Count II asserts that the Defendants breached their contract with Allahverdi by terminating him without just cause and without the procedures promised him in the event he was accused of misconduct.  <u>See</u> <u>id.</u> ¶¶ 69-76, at 14-15.  Count III states a cause of action for breach of the implied covenant of good faith and fair dealings

because the Defendants allegedly refused to provide Allahverdi with a hearing in a timely manner and singled out Allahverdi for disproportionate punishment.  See id. ¶¶ 77-80, at 15-16.  Count IV seeks an injunction preventing the Defendants from terminating him.  See id. ¶¶ 81-89, at 17-18.  Allahverdi requests compensatory and punitive damages, injunctive relief, costs, and attorney's fees.  See id. at 19.  The Defendants removed on the basis of federal question jurisdiction.  See Notice of Removal at 2.

The Defendants filed their motion for summary judgment on October 31, 2005.  The Defendants argue that Allahverdi waived any due process rights he initially possessed when he agreed to be placed in zero tolerance probation.  See Motion for Summary Judgment at 10-11.  Even if he had not waived his due process rights, the Defendants contend that Allahverdi received all the due process to which he was entitled because his dismissal was academic in nature and academic dismissal does not require a formal hearing.  See id. at 11-12.

Allahverdi responds that the Second Graduate Medical Education Agreement's term providing for the grievance procedures outlined in the House Officer's Manual superseded any waiver to which he might have agreed in exchange for being placed on probationary status.  See Plaintiff's Response at 15.  Allahverdi maintains that the University did not accord him due process when he was terminated.  See id. at 16.  He states that he was not provided with an adequate pre-termination hearing or an adversarial post-termination hearing where he could call witnesses and cross-examine opposing witnesses.  See id. at 17.

## LAW REGARDING PROCEDURAL DUE PROCESS

### 1.  General Protections.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution

guarantees that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law. . . ."  The United States Court of Appeals for the Tenth Circuit has recognized that the Due Process Clause contains procedural and substantive components, with procedural due process ensuring that "a state will not deprive a person of life, liberty or property unless fair procedures are used in making that decision."  Hennigh v. City of Shawnee, 155 F.3d 1249, 1253 (10th Cir. 1998)(quoting Archuleta v. Colorado Dep't of Insts., Div. of Youth Servs., 936 F.2d 483, 490 (10th Cir. 1991))(internal quotations omitted).  The Court must engage in a two-part analysis to determine if a state has deprived an individual of procedural due process: (i) "Did the individual possess a protected interest to which due process protection was applicable?"; and (ii) "Was the individual afforded an appropriate level of process?"  Id. (citing Watson v. University of Utah Med. Ctr., 75 F.3d 569, 577 (10th Cir. 1996)).

A protected interest can be either a property or liberty interest.  See Hennigh v. City of Shawnee, 155 F.3d at 1253.  The Constitution does not create property interests; instead, property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law."  Cleveland Bd. of Education v. Loudermill, 470 U.S. 532, 538 (1985)(citations and internal quotations omitted).

When analyzing the second prong of the two-part due process test -- whether the plaintiff was afforded an appropriate level of process -- courts "should pay no attention to whether the state has complied with procedures mandated by state law."  Hulen v. Yates, 322 F.3d 1229, 1247 (10th Cir. 2003).  While state law determines whether a person has a property interest, "it is purely a matter of federal constitutional law whether the procedure afforded was adequate."  Id.

2.      **Due Process in Employment Cases.**

When the asserted property interest is continued employment by a state, the plaintiff must

show "a legitimate expectation of continued employment." Garcia v. City of Albuquerque, 232 F.3d

760, 769 (10th Cir. 2000)(citations and internal quotations omitted).  When a plaintiff possesses a

property interest in employment, proper pre- and post-termination procedures must be accorded to

the terminated employee.  See Cleveland Bd. of Education v. Loudermill, 470 U.S. at 547-48.  Before

termination, due process requires "notice and an opportunity to respond."  West v. Grand County,

967 F.2d 362,  367 (10th Cir. 1992)(citing Cleveland Bd. of Education v. Loudermill, 470 US. at

546).

The hearing's level of formality and procedural trappings can vary based on "the importance

of the interests involved and the nature of the subsequent proceedings." Cleveland Bd. of Education

v. Loudermill, 470 U.S. at 545 (citations and internal quotations omitted).  "'[S]omething less' than

a full evidentiary hearing is sufficient prior to" termination.  Id. (quoting Mathews v. Eldridge, 424

U.S., 319, 343 (1976)).  An employee "is entitled to oral or written notice of the charges against him,

an explanation of the employer's evidence, and an opportunity to present his side of the story."  Id.

at 546 (citations omitted).  "[P]retermination warnings and an opportunity for a face-to-face meeting

with supervisors, and a conversation between an employee and his supervisor immediately prior to

the employee's termination," satisfy procedural due process. West v. Grand County, 967 F.2d at 367

(citations omitted).

More due process protections are required for post-termination hearings than pre-termination

hearings, because the former hearings are "where the definitive fact-finding occurs."  Id. at 368-69

(citations and internal quotations omitted).  The post-termination hearing must be held "at a

meaningful time" and, "[a]t some point, a delay in the post-termination hearing would become a constitutional violation." Cleveland Bd. of Education v. Loudermill, 470 U.S. at 547 (citations and internal quotations omitted). Whether the rights to cross-examine or confront witnesses attach to a post-termination hearing "depends upon the significance and nature of the factual disputes at issue"; those rights do not apply per se to all post-termination hearings. West v. Grand County, 967 F.2d at 369. For example, "charges depriving a plaintiff of her livelihood by attacking her morality and fitness as a teacher are sufficiently serious to require cross-examination," because the allegations "might stain a reputation and threaten a livelihood." McClure v. Independent Sch. Dist. No. 16, 228 F.3d 1205, 1211 (10th Cir. 2000)(citing McGhee v. Draper, 564 F.2d 902, 911-12 (10th Cir. 1977))(internal quotations omitted).

> **3.** **Due Process for Students.**

> **a.** **Levels of Due Process for Students.**

When the asserted property interest is continued education by the state, the level of due process required depends on whether dismissal was for academic or disciplinary reasons. See Board of Curators of University of Missouri v. Horowitz, 435 U.S. 78, 86 (1978)(describing the "difference between the failure of a student to meet academic standards and the violation by a student of valid rules of conduct" as "significant"). When the dismissal is for academic reasons, a student is not entitled to a hearing. See Trotter v. Regents of the Univ., 219 F.3d 1179, 1185 (10th Cir. 2000)(citing Board of Curators of University of Missouri v. Horowitz, 435 U.S. at 86-90). Instead, the academically dismissed student must have prior notice of faculty dissatisfaction with his or her performance and of the possibility of dismissal, and the decision to dismiss the student must be careful and deliberate. See id. (citing Schuler v. University of Minn., 788 F.2d 510, 514 (8th Cir. 1986)).

Academic dismissal can include expulsion for reasons such as personal hygiene and timeliness, because these "may be as important factors in a school's determination of whether a student will make a good medical doctor as the student's ability to take a case history or diagnose an illness." Board of Curators of University of Missouri v. Horowitz, 435 U.S. at 91 n.6.

If the student is suspended for a short period of time, such as ten days or less, for disciplinary reasons, then the student must be given "oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." Board of Curators of University of Missouri v. Horowitz, 435 U.S. at 85 (quoting Goss v. Lopez, 419 U.S. 565 (1975))(internal quotations omitted). The opportunity to be heard requires only "an informal give-and-take between the student and the administrative body dismissing him that would, at least, give the student the opportunity to characterize his conduct and put it in what he deems the proper context." Id. at 86 (citations and internal quotations omitted). If the student is given a long-term suspension or is expelled, then the Court must balance three factors to determine if the student is entitled to additional procedures: (i) "the private interest that will be affected by the official action"; (ii) "the probable value, if any, of additional or substitute procedural safeguards"; and (iii) "the government's interest, including the fiscal and administrative burden, that the additional or substitute procedural requirements would entail." Watson v. Beckel, 242 F.3d 1237, 1240 (10th Cir. 2001)(citing Mathews v. Eldridge, 424 U.S. 319, 334-35 (1976)).

    **b.**    **Distinction Between Academic and Disciplinary Dismissals.**

As the Court's discussion of the Due Process Clause's applicability to students indicates, an important distinction is whether the educational institution dismissed or suspended a student for academic or disciplinary reasons, because the standard for due process varies depending on which

-20-

side of that line the punishment falls.  See Board of Curators of University of Missouri v. Horowitz, 435 U.S. at 85; Trotter v. Regents of the Univ., 219 F.3d at 1185.  The Court has found no case, either from the Supreme Court or from one of the Circuits, that provides a working definition of each category such that the Court could be sure that a particular dismissal qualifies as academic rather than disciplinary, or vice versa.  Looking at cases where courts have had to describe a punishment as academic or disciplinary, however, suggests functional definitions.

The Supreme Court has explained that personal conduct, and not just scholarship, can lead to an academic dismissal when it relates to whether the student will make a good doctor.  See Board of Curators of University of Missouri v. Horowitz, 435 U.S. at 91 n.6 ("Personal hygiene and timeliness may be as important factors in a school's determination of whether a student will make a good medical doctor as the student's ability to take a case history or diagnose an illness.").  While an evaluation of such conduct might seem objective – it appears to rest on the question whether the person engaged in that behavior – in actuality "the school considers and weighs a variety of factors, not all of which, as noted earlier, are adaptable to the factfinding hearing" required in disciplinary dismissals.  Id.

In Hennessy v. City of Melrose, 194 F.3d 237 (1st Cir. 1999), the United States Court of Appeals for the First Circuit dealt with a student who, while student-teaching: (i) refused to take part in a multicultural assembly and described it as "lewd and offensive" to biblical principles; (ii) showed a picture of an aborted fetus to a teacher; (iii) stormed out of a presentation of an adaptation of Leonardo da Vinci's painting of the Last Supper that portrayed celebrities instead of the disciples; and (iv) called the principal "the devil" and the school's teachers her disciples.  Id. at 242-43.  The school where he taught forbade him from student-teaching there any more, and as a result he failed

his student practicum requirement and his home institution dismissed him from the program. See id. at 243-44. The First Circuit considered this to be an academic dismissal rather than a disciplinary dismissal because the student's conduct "spoke volumes about his capacity to function professionally in a public school setting." Id. at 251. His home institution's faculty had judged that "he had neither completed the required assignments nor demonstrated the practical qualities necessary to perform efficaciously as a public school teacher." Id. The First Circuit noted that this academic determination "had a subjective cast." Id.

The Sixth Circuit considered a medical student who engaged in immature behavior around patients, including asking impertinent sexual questions, touching patients in an inappropriate manner, asking a female patient on a date, and speaking in a sarcastic and critical tone to a suicidal patient. See Firester v. Bd. of Governors of Wayne State University, No. 89-1772, 1990 U.S. App. LEXIS 12167, at *2-3 (6th Cir. 1990). The Sixth Circuit concluded that his conduct warranted academic dismissal because "proper attitudes toward patients are important factors in determining whether a student will be a good doctor." Id. at 6.

The United States Court of Appeals for the Seventh Circuit had "no difficulty" deciding that a medical resident was dismissed for academic reasons because he failed to disclose, on his application, an earlier dismissal from another residency program. See Fenje v. Feld, 398 F.3d 620, 625 (7th Cir.), rehearing and rehearing en banc denied, 2005 U.S. App. LEXIS 6175 (7th Cir. April 6, 2005). This omission undermined "his future credibility as a source of information concerning the care of seriously ill patients." Id. The Seventh Circuit emphasized "the nexus between [the resident's] lack of candor in the application process and his capacity to be trusted with patient care." Id. The dismissal was academic because it represented "an academic judgment by school officials,

expert in the subjective evaluation of medical doctors, that [the resident] did not possess the attributes necessary to adequately perform his clinical duties as an anesthesiology resident." Id.

The threads that bind these cases are the following.  First, the students' actions in these cases, and not just their scholarship, qualified them for academic dismissal.  See Board of Curators of University of Missouri v. Horowitz, 435 U.S. at 91 n.6 (personal hygiene and timeliness); Fenje v. Feld, 398 F.3d at 625 (lying on a residency application); Hennessy v. City of Melrose, 194 F.3d at 242-43 (acting inappropriately at an assembly, showing a picture of an aborted fetus, storming out of a presentation, and calling his boss the devil); Firester v. Bd. of Governors of Wayne State University, 1990 U.S. App. LEXIS 12167, at *2-3 (inappropriate behavior toward patients).  The conduct involved related to qualities in the student that were necessary for success in his or her chosen field.  See Board of Curators of University of Missouri v. Horowitz, 435 U.S. at 91 (personal hygiene and timeliness can bear on whether a student will be a good doctor); Fenje v. Feld, 398 F.3d at 625 (resident's dishonesty had a "nexus" to capacity to be trusted with patient care); Hennessy v. City of Melrose, 194 F.3d at 251 (inappropriate behavior "spoke volumes about [the student's] capacity to function professionally in a public school setting"); Firester v. Bd. of Governors of Wayne State University, 1990 U.S. App. LEXIS 12167, at *2-3 (proper attitudes toward patients are considered to be important factors in determining whether a student will be a good doctor).  Finally, several of the cases recognized that these academic judgments rested not solely on an objective examination of the student's conduct, but also on a subjective estimation of the student's abilities.  See Board of Curators of University of Missouri v. Horowitz, 435 U.S. at 91 n.6 (dismissal a result of factors not all of which are adaptable to a factfinding hearing); Fenje v. Feld, 398 F.3d at 625 (dismissal resulted from "academic judgment by school officials, expert in the subjective evaluation

-23-

of medical doctors, that [the resident] did not possess the attributes necessary to adequately perform his clinical duties as an anesthesiology resident"); Hennessy v. City of Melrose, 194 F.3d at 251 (decision to dismiss had a "subjective cast").

Accordingly, federal courts have found an academic dismissal where a student's scholarship or conduct reflects on the personal qualities necessary to succeed in the field in which he or she is studying and is based on an at least partially subjective appraisal of those qualities. The Court recognizes that this definition of academic dismissal is very broad and leaves a finding of disciplinary dismissal to a narrow range of cases. Yet such a broad definition of academic is necessary to protect what the Supreme Court has stated is "the historic judgment of educators" to evaluate their students' academic abilities. Board of Curators of University of Missouri v. Horowitz, 435 U.S. at 90. The Supreme Court has expressed its fear of injecting an adversarial tone into the "continuing relationship between faculty and students, one in which the teacher must occupy many roles -- educator, adviser, friend, and, at times, parent-substitute." Id. (citation omitted). The Supreme Court has warned against "further enlarg[ing] the judicial presence in the academic community and thereby risk[ing] deterioration of many beneficial aspects of the faculty-student relationship." Id. If the Court errs in concluding whether an act is academic or dismissal, then it should do so on the side of academics because the Supreme Court has expressed a strong desire not to interfere in the academic relationship between student and teacher that is vital for the continuing health of education in our country. See id. Given the risk that judicial involvement in the student-teacher relationship risks "deterioration of many beneficial aspects of the faculty-student relationship," the Court's definition satisfies this concern by defining academic broadly. Id.

Turning to a definition of disciplinary dismissal, the Supreme Court explained that disciplinary

actions are less subjective and evaluative than academic dismissals.  See id. at 90.  In Martello v. University of Medicine & Dentistry, 781 F.2d 46 (3d Cir. 1986), the United States Court of Appeals for the Third Circuit had "no difficulty" concluding that a student's dismissal was for academic, not disciplinary, reasons, because "it was not a case of [the student] being compelled by rule, order, or law of the school to do something and not having done it getting discharged. . . . This is not a case of somebody being disruptive in her misconduct."  781 F.2d at 50 (internal quotations omitted).  The Seventh Circuit determined that disciplinary dismissals "are those involving the violation by a student of valid rules of conduct or disruptive and insubordinate behavior.  Disciplinary dismissals, being more objective in nature and not dependent upon the analytical expertise of professional academicians, will bear a resemblance to traditional judicial and administrative factfinding."  Fenje v. Feld, 398 F.3d at 625 (citations and internal quotations omitted).  These cases demonstrate that disciplinary dismissals are objective in nature and relate to rules of conduct rather than a student's professional abilities.  Courts are also more willing to step in when a dismissal is disciplinary because it does not involve subjective evaluations of a student's performance like an academic dismissal does. In an attempt to give content to the Supreme Court's phrase "disciplinary dismissal," the Court believes an academic institution imposes a disciplinary dismissal in the more limited situation where a student has violated the rules of conduct that the educational institution has set forth and is based on an objective appraisal of the student's conduct.

## C.    MEDICAL RESIDENTS

In Davis v. Mann, 882 F.2d 967 (5th Cir. 1989), the United States Court of Appeals for the Fifth Circuit addressed what process is due medical residents when they are terminated.  The plaintiff entered into the General Practice Residency Program at the University of Mississippi by signing a

contract that stated that "the University would provide an appropriate educational program for [the plaintiff] and that [the plaintiff] in return would 'fulfill the educational requirements for the program.'" Davis v. Mann, 882 F.2d at 968-69.  The University of Mississippi's program "operated like a typical medical residency." Id. at 969.  The Fifth Circuit concluded that residents should be treated like students, and not employees, because

> [t]he residency program is distinct from other types of employment in that the resident's "work" is what is academically supervised and evaluated. It is well-known that the primary purpose of a residency program is not employment or a stipend, but the academic training and the academic certification for successful completion of the program. The certificate, like the diploma, tells the world that the resident has successfully completed a course of training and is qualified to pursue further specialized training or to practice in specified areas. . . . Successful completion of the residency program depends upon subjective evaluations by trained faculty members into areas of expertise that courts are poorly equipped to undertake in the first instance or to review. . . . The fact that [the plaintiff] received a stipend for his clinical training in addition to the opportunity to successfully complete the [residency] program does not alter the fact that he was participating in an academic program in order to receive academic certification.

Id. at 974.  Given the plaintiff's status as a student, the Davis Court applied the procedural due process requirements afforded to students, not employees.  See id. at 973.

At the time, the Fifth Circuit in Davis v. Mann may have left open the possibility that a resident might have an employment interest in a residency, separate from his property interest in the non-economic, instructional and education aspects, that would require more procedural protections before the termination of his employment.  The Fifth Circuit stated that it "need not inquire what process was due or whether that process was afforded [the plaintiff] prior to his termination from employment, because it is undisputed that [the plaintiff] received his full salary under his employment contract." Id.  The Fifth Circuit, however, closed that possible gap in its due process law in Shaboon v. Duncan, 252 F.3d 722 (5th Cir. 2001), when it stated flatly that "medical residents are not

-26-

employees protected by the [D]ue [P]rocess [C]lause." 252 F.3d at 732 (citing Davis v. Mann, 882 F.2d at 974). The Fifth Circuit explained that "the economic and noneconomic benefits of the employment were inseparable from and ultimately dependent upon the plaintiff's academic performance in the residency itself." Id. (citing Davis v. Mann, 882 F.2d at 974).

Two other Circuits have indicated agreement with the Fifth Circuit's holding that residents are students under the Due Process Clause. In Ezekwo v. New York City Health & Hosps. Corp., 940 F.2d 775 (2d Cir. 1991), a resident filed suit because her program declined to make her chief resident. See id. at 778-79. To determine what process the resident was due, the United States Court of Appeals for the Second Circuit compared the resident to a student and applied the standard given to students who had been disciplined – in effect, notice and an opportunity to be heard – because the Circuit concluded that the decision to exclude her from the position, based on standards introduced at the last minute, was not an academic decision. See id. at 784-86 (concluding that the defendants should have provided the resident with notice and "an opportunity to respond to [the defendants'] concerns before a final decision was made"). The United States Court of Appeals for the Seventh Circuit also treated a medical resident as a student in deciding that he was dismissed for academic reasons for lying on his application form. See Fenje v. Feld, 398 F.3d at 624-27. In Fenje v. Feld, the district court had explicitly found the resident to be a student because a residency program is "primarily a learning position for which the limited due process rights afforded an academic decision about a student apply." Fenje v. Feld, 301 F. Supp. 2d 781, 801 (N.D. Ill. 2003).

## LAW ON SUPPLEMENTAL JURISDICTION

28 U.S.C. § 1367(a) recognizes that, when a district court has original jurisdiction over a civil action, "it has supplemental jurisdiction over all other claims that are so related to claims in the action

within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  A district court may decline to exercise supplemental jurisdiction if "the district court has dismissed all claims over which it has original jurisdiction."  Id. § 1367(c). A district court is "well within its discretion in declining supplemental jurisdiction over the remainder of" a case when it dismisses a plaintiff's federal claims.  Exum v. United States Olympic Comm., 389 F.3d 1130, 1139 (10th Cir. 2004).   When a federal claim no longer supports supplemental jurisdiction, the Tenth Circuit has recognized that, consistent with 28 U.S.C. § 1367(c)(3), the ordinary response will be to dismiss the state law claims without prejudice.  See Roe v. Cheyenne Mountain Conference Resort, Inc., 124 F.3d 1221, 1237 (10th Cir. 1997); Ball v. Renner, 54 F.3d 664, 669 (10th Cir. 1995).  "Section 1367 reflects the understanding that, when deciding whether to exercise supplemental jurisdiction, a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity."  Gold v. Local 7 United Food & Commer. Workers Union, 159 F.3d 1307, 1310 (10th Cir. 1998)(citations and internal quotations omitted).

## ANALYSIS

The Court will grant the Defendants' Motion for Summary Judgment in part.  The Court will grant the Defendants' motion on Allahverdi's procedural due process claim because there is no genuine issue that he received all the process to which he was entitled.  With the only federal claim in this case dismissed, the Court will remand the remaining state claims to state court.

## I.   THE COURT GRANTS THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON ALLAHVERDI'S PROCEDURAL DUE PROCESS CLAIM.

The Defendants have shown that there is no genuine issue of material fact that Allahverdi

received all of the due process required under the Constitution. The Due Process Clause commands that a state will not deprive a person of life, liberty or property unless fair procedures are used in making that decision. See Hennigh v. City of Shawnee, 155 F.3d at 1253. To determine if a state has deprived an individual of procedural due process, courts must conduct the following two-part inquiry: (i) Did the individual possess a protected interest to which due process protection was applicable?; and (ii) Was the individual afforded an appropriate level of process? See id. Assuming that Allahverdi possessed a protected interest in continuing his medical residency, and that Allahverdi did not waive his procedural due process rights, Allahverdi qualified for the due process protections accorded to students, not employees, and the Defendants gave Allahverdi all the due process that the Constitution mandates for students dismissed for academic reasons.

### A.    ALLAHVERDI IS A STUDENT.

At the outset, the Court must determine the appropriate level of due process for Allahverdi's position at the University. The Defendants argue that medical residents, like Allahverdi, are students and so are entitled to due process to the same extent as students facing dismissal. See Motion for Summary Judgment at 14. Allahverdi points to the hybrid nature of a medical residency – part academic and part employment – and contends that he should receive no less due process than an employee before and after termination. See Plaintiff's Response at 20. The distinction is important because a student, whether dismissed for academic or disciplinary reasons, may receive less due process than an employee. Compare Cleveland Bd. of Education v. Loudermill, 470 U.S. at 542-48, and West v. Grand County, 967 F.2d at 367-70, with Board of Curators of University of Missouri v. Horowitz, 435 U.S. at 85-91, and Trotter v. Regents of the Univ., 219 F.3d at 1184-85. See also Davis v. Mann, 882 F.2d at 973 ("Courts overwhelmingly agree that students, whether dismissed for

academic or disciplinary reasons, are not entitled to as much procedural protection under the Fourteenth Amendment as employees who are terminated from their jobs."). The Defendants have the better of the argument.

After graduating from medical school, newly minted doctors typically begin a residency, lasting at least one year, where they treat patients under a more experienced doctor's supervision. See Jennifer F. Whetsell, "Changing the Law, Changing the Culture: Rethinking the 'Sleepy Resident' Problem," 12 Annals of Health Law 23, 26 (2003)(hereinafter "Whetsell"); Dori Page Antonetti, Comment, "A Dose of their Own Medicine: Why the Federal Government Must Ensure Healthy Working Conditions for Medical Residents and How Reform should be Accomplished," 51 Catholic University Law Review 875, 879 (2002). Most states require doctors to undergo a residency because of the difficulty in giving a comprehensive medical education in just four years. See Whetsell at 25-26.

The Court is not the first to explore the nature of a medical residency and its relationship to a doctor's medical education and entry into the workforce. The Fifth Circuit has faced this issue head on in two cases. In Davis v. Mann, the Fifth Circuit dealt with a fired medical resident challenging the circumstances of his termination. See 882 F.2d at 972. The Fifth Circuit decided that medical residents are students because the resident's work is "academically supervised and evaluated." Id. at 974. Also, the purpose of the residency is "academic training and the academic certification for successful completion of the program." Id. The Fifth Circuit found that certificate to be similar to a diploma in that it "tells the world that the resident has successfully completed a course of training and is qualified to pursue further specialized training or to practice in specified areas." Id. Further, the Fifth Circuit emphasized the fact that "[s]uccessful completion of the residency program depends

-30-

upon subjective evaluations by trained faculty members into areas of expertise that courts are poorly equipped to undertake in the first instance or to review."  Id.

Allahverdi attempts to steer the Court clear of Davis v. Mann because the Fifth Circuit, at one point, appears to eschew making any kind of statement about what process is due to a medical resident.  See Plaintiff's Response at 20 n.9.  Allahverdi highlights that the Fifth Circuit noted, at the beginning of its opinion, that the plaintiff had received all the compensation promised under his contract with the university.  See id. at 973.  Because the plaintiff lost none of his salary, and therefore suffered "no compensable damage from an early employment termination," the Fifth Circuit declined to "inquire what process was due or whether that process was afforded Davis prior to his termination from employment."  Id.

Based on this language, Allahverdi leaps to the conclusion that the Fifth Circuit never tackled the issue whether a resident is an employee or a student.  See Transcript of Hearing at 18:9-19:15. The Court would agree – if Davis v. Mann had ended with the language quoted by Allahverdi. Unfortunately for his argument, Davis v. Mann continues for several more pages and finds that being a medical resident in a hospital is analogous to being a student in a classroom.  See 882 F.2d at 974. Indeed, the Davis court determined that a residency is academic in nature even though he was being paid for it.  See id. at 974.  The Court cannot turn a blind eye to such reasoning.

It is undeniable that tension exists between Davis v. Mann's initial paragraphs, where it declines to decide what due process interest the plaintiff possessed in his employment, and later paragraphs, where it characterizes the plaintiff as a student for due process purposes.  See id. at 973-75.  Although it is not entirely clear how the Fifth Circuit intended to reconcile these portions of its opinion, the Court believes that Allahverdi might be able to argue that Davis v. Mann recognized two

property interests that a resident has in his residency: (i) an economic property interest in his compensated employment with the residency program because of the economic benefit – a salary – that residents receive; and (ii) a non-economic property interest in the duties and responsibilities of his employment.  See id. at 973.  From this starting point, one could interpret Davis v. Mann as mandating only student-level due process protections for the deprivation of a resident's non-economic benefits, which are essentially academic in nature, while at the same time refusing to answer whether a resident has the same due process protections as an employee for the deprivation of a resident's economic benefits because the plaintiff in Davis v. Mann lost no salary.

Such an argument might have some merit, if the Fifth Circuit had not later foreclosed that train of thought in Shaboon v. Duncan.  In that case, the Fifth Circuit stated flatly that Davis v. Mann stood for the proposition that "medical residents are not employees protected by the [D]ue [P]rocess [C]lause."  252 F.3d at 732.  The Shaboon Court approved of the Davis Court's logic that "both the economic and noneconomic benefits of the employment were inseparable from and ultimately dependent upon the plaintiff's academic performance in the residency itself."  Id.  Whatever ambiguity may have arisen in Davis v. Mann, the Court will defer to the Fifth Circuit's interpretation of its own precedent and concludes that the Fifth Circuit has decided that medical residents are students, not employees.

Two other Circuits have also treated residents as students.  The Second Circuit applied the due process standard for student disciplinary actions to a medical resident who had been denied the Chief Resident position.  See Ezekwo v. New York City Health & Hosps. Corp., 940 F.2d at 784-86. The Seventh Circuit also considered a resident, dismissed from his residency for lying on his application, as having been discharged for academic reasons.  See Fenje v. Feld, 398 F.3d at 624-27.

Before the Seventh Circuit had ruled in Fenje v. Feld, the district court affirmatively concluded that residents are students. See Fenje v. Feld, 301 F. Supp. 2d at 801.

With the holdings of three Circuits and one district court in mind, how should this Court rule on Allahverdi's status – student or employee – as a medical resident?  With no Tenth Circuit precedent pointing either way, the Court agrees with the Second, Fifth, and Seventh Circuits that medical residents should be treated as students.  A resident's education and employment are inseparable because a resident is, in effect, being paid to learn. See Davis v. Mann, 882 F.2d at 974. His work is supervised and evaluated – much like a student's – by faculty members. See id. The primary purpose of the residency is not to spend one's life as a resident, but to gain the necessary experience and knowledge to serve as a fully licensed doctor. See id. At the end of the residency, residents earn a "diploma" in the form of a certificate that advertises the academic credential they have received. See id. Although residents receive a paycheck, this compensation does not convert what is, overall, an academic experience into mere employment. The Court agrees with the Fifth Circuit's characterization of a resident's salary as similar to a stipend used to sustain a resident during his time in a residency.[4] See id.

---

[4] Although the Court, in the course of its research into this issue, found no cases going the other way, the Court did find a decision of the National Labor Relations Board ("NLRB") that held that medical residents qualify as employees under the National Labor Relations Act ("NLRA"). See Boston Medical Center Corporation, 330 N.L.R.B. 152 (1999). The Court will not blindly follow the NLRB's decision for three reasons. First, while courts generally give deference to an agency's "reasonable interpretation of a statute it administers," Cruz-Funez v. Gonzales, 406 F.3d 1187, 1191 (10th Cir. 2005)(citing Tapia-Garcia v. INS, 237 F.3d 1216, 1220 (10th Cir. 2001)), the NLRB was interpreting the NLRA, not the Due Process Clause of the Fourteenth Amendment, which is the law at issue in this case.  To take the NLRA's definition of employee and use it to interpret the Constitution would compare apples with oranges.  Second, even if the NLRB had been interpreting the Constitution, then the agency's interpretation would not be entitled to deference because the NLRB administers the NLRA, not the Constitution, and so it would be acting outside its field of expertise. See Sears v. San Diego County Dist. Council of Carpenters, 436 U.S. 180, 217-18

-33-

The Second Graduate Medical Education Agreement bolsters the Court's conclusion that Allahverdi is a student for due process purposes.  In the section titled "Responsibilities," the Agreement calls on Allahverdi to fulfill the educational requirements of his residency for his "individual educational advancement."  Second Graduate Medical Education Agreement at 1.  The Agreement also lists the "[e]ducational activities" in which Allahverdi is expected to take part.  Id. Most importantly, the Agreement states that "[t]hrough these activities [Allahverdi] is expected to achieve competency in the following areas: patient care, medical knowledge, practice based learning and improvement, interpersonal and communication skills, professionalism, and system-based practice"; the Agreement thereby envisions that Allahverdi would become more proficient in certain defined areas through the educational experience of his residency.  Id.  In sum, Allahverdi is entitled, as a medical resident, to the same due process rights as students receive.

## B.    ALLAHVERDI RECEIVED AN APPROPRIATE LEVEL OF DUE PROCESS.

### 1.    Allahverdi's Dismissal Was for Academic Reasons.

Having determined that Allahverdi is a student, the Court must now determine whether the University dismissed Allahverdi from his residency with the correct amount of due process.  Courts have identified three separate due process standards for students depending on the nature of the adverse action taken against them.  If an educational institution dismisses a student for academic reasons, due process does not give that student the right to a hearing.  See Trotter v. Regents of the

---

(1978)(Brennan, J., dissenting).  Finally, the Court recognizes the serious separation of powers issues that would arise if the judicial branch, which is "emphatically" charged with "say[ing] what the law is," Vieth v. Jubelirer, 541 U.S. 267, 277 (2004)(citing Marbury v. Madison, 5 U.S. 137 (1803)), allowed other branches to definitively interpret the Constitution, see City of Boerne v. Flores, 521 U.S. 507, 519 (1997)(warning that Congress does not have the power "to decree the substance" of constitutional provisions).

Univ., 219 F.3d at 1185.  The institution must only provide the student prior notice of faculty dissatisfaction with his or her performance and of the possibility of dismissal, and the decision to dismiss the student must be careful and deliberate.  See id.

On the other hand, if a student is suspended for ten days or less for disciplinary reasons, due process calls for oral or written notice of the charges against the student and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story. See Board of Curators of University of Missouri v. Horowitz, 435 U.S. at 85.  The opportunity to be heard should consist of an informal give-and-take between the student and the administrative body dismissing him that would, at least, give the student the opportunity to characterize his conduct and put it in what he deems the proper context.  See id. at 86.  If the suspension lasts longer than ten days, or if the institution dismisses the student from the academic program for disciplinary reasons, then the Court must balance the following three factors to determine if any additional procedures must be implemented: (i) the private interest that will be affected by the official action; (ii) the probable value, if any, of additional or substitute procedural safeguards; and (iii) the government's interest, including the fiscal and administrative burden, that the additional or substitute procedural requirements would entail.  See Watson v. Beckel, 242 F.3d at 1240.

The Defendants maintain that the University showed Allahverdi the door for academic reasons that go to the heart of his fitness as a doctor.  His dismissal, in the Defendants' view, was based "on the academic judgment of school officials that he did not have the necessary clinical ability to perform adequately as a medical doctor and was making insufficient progress toward that goal."  Motion for Summary Judgment at 12.  The Defendants highlight the allegations that Allahverdi did not know to ask about cardiac risk factors in a patient with chest pain and did not recognize that one of his

patients had a foley catheter placed.  See id. at 12.  Allahverdi also allegedly failed to check out

properly after his shift ended and then lied about it.  See id.  Finally, the Defendants also look to his

"refusal to acknowledge and deal with his interpersonal problems and unsatisfactory conduct" as a

basis for his academic dismissal.  Id. at 12-13.  In response, Allahverdi characterizes the allegations

against him as behavioral; for example, the University alleges that he called people names.  See

Transcript of Hearing at 17:7-20.

   The Defendants have shown that there is no genuine issue that Allahverdi's dismissal was for

academic, not disciplinary, reasons.  An academic dismissal is where a student's scholarship or

conduct reflects on the personal qualities necessary to succeed in the field in which he or she is

studying, and can be based on an at least partially subjective appraisal of those qualities.  See Board

of Curators of University of Missouri v. Horowitz, 435 U.S. at 91 n.6; Fenje v. Feld, 398 F.3d at 625

Hennessy v. City of Melrose, 194 F.3d at 242-43, 251; Firester v. Bd. of Governors of Wayne State

University, 1990 U.S. App. LEXIS 12167, at *2-3.  The Defendants must therefore show that there

is no genuine issue that Allahverdi's scholarship or conduct reflected on personal qualities necessary

to succeed in the field of medicine.

   The Second Family Practice Committee outlined four reasons for dismissing Allahverdi from

his residency.  Two of those justifications dealt directly with his competence as a doctor: (i) his failure

to "complete accurate and timely check out at the end of a duty period.  [He was] noted on March

24, 2003 and on at least one other occasion, to not check out or not check out completely or in a

timely fashion with the covering team"; and (ii) his "[i]nability to satisfactorily perform all duties of

first year house officers in Family Practice" because he demonstrated "an inadequate medical

knowledge base and clinical skills significantly below that necessary to function at a minimally

acceptable level, . . . [including] not knowing to ask about cardiac risk factors in a patient with chest pain, not knowing basic parameters of urine protein in nephrotic syndrome, and not recognizing that one of [his] patients had a foley catheter placed."  Bachofer April 15 Letter at 1-2.  In both areas, Allahverdi's conduct reflected on the qualities necessary to succeed in the medical profession: the first area involved his ability to follow appropriate medical procedures in handing off patients from one shift to another; in the second area, Allahverdi failed to competently perform the duties and demonstrate the medical knowledge required of a doctor in the Family Practice.

The third and fourth grounds for dismissal were his "[f]ailure to truthfully report [his] behavior with respect to patient care duties" and "[u]se of unacceptable language in reference to the staff of UNM HSC during the course of patient care activities."  Id. at 1.  At first blush, misrepresenting the facts and using inappropriate language might appear to fall more on the disciplinary side of the line because they involve Allahverdi's conduct toward his fellow co-workers. Yet the Supreme Court and several Circuits have indicated that conduct is academic when it reflects on the personal qualities necessary to succeed in the field in which he or she is studying.  See Board of Curators of University of Missouri v. Horowitz, 435 U.S. at 91 n.6; Fenje v. Feld, 398 F.3d at 625 Hennessy v. City of Melrose, 194 F.3d at 242-43, 251; Firester v. Bd. of Governors of Wayne State University, 1990 U.S. App. LEXIS 12167, at *2-3.

These latter two grounds, lying and inappropriate language, reflect on Allahverdi's ability to engage in professional behavior expected of a doctor in a professional setting.  As the Second Family Practice Committee explained to Allahverdi, his use of unacceptable language contradicted the expectation that "all members of the healthcare team will be treated *professionally* in the course of performing their duties."  Bachofer April 15 Letter at 1 (emphasis added).  The Second Family

-37-

Practice Committee concluded that Allahverdi's inappropriate language violated the zero tolerance for such behavior imposed by the First GME Committee, which had stated: "If you exhibit behavior that is inconsistent with *professional* behavior, you will be immediately dismissed from the program." Wilks December 17 Letter at 1 (emphasis added). In addition, Bachofer's recital of the conditions placed on his employment following reinstatement stated that "[a]ny behaviors *deemed to be inconsistent with professional conduct* in any setting related to residency activities will be cause for immediate dismissal without recourse." Bachofer February 20 Letter at 2 (emphasis added). Similarly, lying fell afoul of the University's requirement that residents must "maintain the highest standards of honesty and integrity in *professional* matters." Id. (emphasis added). Rather than dismiss Allahverdi for his conduct simply because it violated a code of conduct, the Second Family Practice Committee linked his behavior to the *professional* qualities necessary for success as a doctor: treating fellow doctors, nurses, and other co-workers with respect, and acting with honesty and integrity while practicing medicine. Evaluating Allahverdi's behavior as a professional, the Second Family Practice Committee stood in judgment of Allahverdi professional characteristics, transforming what might have otherwise been a disciplinary action into an academic one.

Allahverdi responds by contending that these allegations are disciplinary in nature because these allegations involve behavior. See Transcript of Hearing at 17:7-20. Allahverdi's argument sweeps too broadly, for it would encompass conduct that the Supreme Court and several Circuits have labeled as academic. For instance, the Supreme Court has acknowledged that personal hygiene and timeliness can be academic, because these behaviors help to illustrate whether one will be a good medical doctor. See Board of Curators of University of Missouri v. Horowitz, 435 U.S. at 91 n.6. The Tenth Circuit decided that a dismissal for attendance was academic. See Harris v. Blake, 798

F.2d 419, 423 (10th Cir. 1986).  The Fifth Circuit found that an institution's dismissal of a student for her refusal to manage her mental health problems was academic.  See Shaboon v. Duncan, 252 F.3d at 731.  The Fifth Circuit also concluded that an expulsion was academic because it involved, in part, falling asleep in class and turning in assignments late.  See Wheeler v. Miller, 168 F.3d 241, 248 (5th Cir. 1999).  The United States Court of Appeals for the Eighth Circuit saw an academic dismissal for action taken against a student for the following behavior: "failing exams, inappropriate behavior during class, lack of preparation, tardiness and absenteeism, and inappropriate interaction with instructors."  Richmond v. Fowlkes, 228 F.3d 854, 858 (8th Cir. 2000).

Several Circuits have also found allegations similar to those hurled against Allahverdi, lying and inability to interact appropriately with others, to be academic in nature.  The Seventh Circuit characterized a resident's dismissal for lying on his residency application as academic, because his misrepresentations reflected on the honesty that doctors must demonstrate in conveying information about patients.  See Fenje v. Feld, 398 F.3d at 625-26.  In Corso v. Creighton University, 731 F.2d 529 (8th Cir. 1984), the Eighth Circuit interpreted a contract between a student and a university to determine whether the student was entitled to academic or disciplinary procedures under the contract.  See id. at 531.  The Eighth Circuit decided that dismissing a student for lying to cover up cheating was academic because cheating was an academic offense and the student's lies related to the cheating.  See id. at 532.  Likewise, Allahverdi's alleged lying led to the Second Family Practice Committee terminating him because it reflected on the personal qualities necessary to be a doctor – he failed to "maintain the highest standards of honesty and integrity in professional matters."  Bachofer April 15 Letter at 1.  Also, Allahverdi allegedly lied "with respect to patient care duties."  Id.  As the Court explained above, competently performing the duties of a medical doctor, like patient care, is necessary

to being a good doctor, thereby making it an academic matter, and Allahverdi's alleged lying related to that academic matter. Allahverdi's alleged lying was therefore an academic issue.

Regarding interactions with others, the Tenth Circuit has held that a student's dismissal from a program for, in part, inappropriate behavior in class, such as turning her back to the teacher and speaking with other students during lectures, is an academic dismissal. Ornelas v. Regents of the Univ. of N.M., No. 99-2123, 2000 U.S. App. LEXIS 21151, at *4, 12, 13-16 (10th Cir. August 21, 2000). In addition, the Sixth Circuit determined that an institution's placement of a student on an immediate leave of absence for, in part, "'unprofessional' conduct" and "inability to interact with others in a basic professional manner" was an academic dismissal. Ku v. Tennessee, 322 F.3d 431, 435-36 (6th Cir.), rehearing denied, 2003 U.S. App. LEXIS 11104, at *1-2 (6th Cir. May 6, 2003). In Hennessy v. City of Melrose, 194 F.3d at 237, the First Circuit characterized as academic a student's dismissal for the following conduct occurring while he was a student teacher: (i) refusing to take part in a multicultural assembly and describing it as "lewd and offensive" to biblical principles; (ii) showing a picture of an aborted fetus to a teacher; (iii) storming out of a presentation of an adaptation of Leonardo da Vinci's painting of the Last Supper that portrayed celebrities instead of the disciples; and (iv) calling the principal "the devil" and the school's teachers her disciples. Id. at 242-43, 251. This conduct, which led to the student's dismissal from his employment at a school and consequently his dismissal from the student teaching program, was academic, because the student had failed to demonstrate "the practical qualities necessary to perform efficaciously as a public school teacher" and his actions "spoke volumes about his capacity to function professionally in a public school setting." Id. at 251. Similarly, the Second Family Practice Committee decided that Allahverdi's inability to interact in a professional manner with others impacted the qualities necessary

to be a successful medical doctor.  See Bachofer April 15 Letter at 1.

Furthermore, including these two areas of conduct in the definition of academic effectuates the policy of non-interference with the historic judgment of educators in academic matters.  See Board of Curators of University of Missouri v. Horowitz, 435 U.S. at 90.  The Supreme Court has warned against "enlarg[ing] the judicial presence in the academic community and thereby risk[ing] deterioration of many beneficial aspects of the faculty-student relationship."  Id.  Faced with the task of classifying grounds for dismissal as either academic or disciplinary, courts have found the scope of academic grounds to be broad.[5]  Placing Allahverdi's alleged lying and inappropriate language in

---

[5] Disciplinary grounds appear to be limited to those instances where the student is being suspended or expelled because he violated a specific rule of conduct, rather than being suspended or expelled based on a professional judgment of the student's professional qualities as exemplified by his scholarship or conduct.  See Fenje v. Feld, 398 F.3d at 625; Martello v. University of Medicine & Dentistry, 781 F.2d at 50.  These rules typically operate to protect the institution as an institution – e.g., rules against violence, stealing, disruptive actions, and law-breaking.  See Flaim v. Med. College of Ohio, 418 F.3d 629, 632-34 (6th Cir. 2005) (disciplinary proceeding for student's violation of zero-tolerance drug policy and guilty plea to a felony drug offense); Fenje v. Feld, 398 F.3d at 625 (defining disciplinary grounds as "the violation by a student of valid rules of conduct or disruptive and insubordinate behavior" (internal citations omitted)); Osteen v. Henley, 13 F.3d 221, 222-23, 225-26 (7th Cir. 1993) (disciplinary proceeding against student who allegedly broke the noses of two people during a fight); Henson v. Honor Committee of U. Va., 719 F.2d 69, 73-74 (4th Cir. 1983) (disciplinary proceeding against law school student who allegedly stole a moot court problem) Gabrilowitz v. Newman, 582 F.2d 100, 101 (1st Cir. 1978)(disciplinary proceeding against student who allegedly committed assault with intent to commit rape on another student).

At first glance, Nash v. Auburn University, 812 F.2d 655 (11th Cir. 1987), might appear to be an exception to this rule, because the Eleventh Circuit analyzed students' suspension for cheating under the standards for a disciplinary proceeding.  See id. at 657, 660.  It does not appear, however, that the defendant challenged whether the proceeding was disciplinary or academic; the issue whether the proceeding was academic or disciplinary does not appear to have arisen in the case.  Furthermore, Nash v. Auburn University is distinguishable, because the Eleventh Circuit made no mention of a professional evaluation, by the disciplinary board, of how the alleged dishonesty reflected on the personal qualities necessary in the students' professional field; instead, it appears that the disciplinary board based its decision on whether the students had violated school policies against cheating.  See id. at 657-58.  Because the disciplinary board's evaluation did not focus on an academic judgment of the students' professional qualities, but instead on a disciplinary judgment of the students'

-41-

the academic context raises less risk that the Court will harm the relationship between educators and students.[6]

## 2.    Allahverdi Received the Process Required for Academic Dismissals.

When a student has been dismissed for academic reasons, he or she is not entitled to a hearing. See Trotter v. Regents of the Univ., 219 F.3d at 1185.  Instead, the academically dismissed student must have prior notice of faculty dissatisfaction with his or her performance and of the possibility of dismissal, and the decision to dismiss the student must be careful and deliberate. See id.  There is no genuine issue that Allahverdi received this process, and more.

Allahverdi received prior notice of faculty dissatisfaction because the First Family Practice Committee terminated him for similar conduct.  See Bachofer November 22 Letter at 1-2.  Although the First GME Committee reinstated Allahverdi, it also warned Allahverdi that the First Family Practice Committee "had just cause to dismiss you from the program for your repeated acts of misconduct, for intentionally omitting your residency in Pontiac, MI from your application to UNM

---

obedience to specific rules of conduct, the proceedings fell on the disciplinary side.

[6] At a hearing on March 13, 2006, Allahverdi asked the Court to consider a discussion in Gossett v. Oklahoma ex rel. Bd. of Regents for Langston Univ., 245 F.3d 1172 (10th Cir. 2001), about academic dismissals.  The Court has reviewed the case, but finds its procedural due process section unhelpful in arriving at a working definition of academic and disciplinary dismissals.  In that case, a plaintiff filed suit for gender discrimination under Title VII and for violation of his right to procedural due process in the course of his dismissal from a nursing program.  See id. at 1176-82.  The Tenth Circuit concluded that the plaintiff had established a genuine issue as to the Title VII claim based on affidavits showing that male students were treated differently than female students; this evidence also established a genuine issue whether the plaintiff's dismissal was based on an academic judgment or on unlawful discrimination.  See id.  While the case distinguishes between academic and discriminatory reasons, it does not distinguish between dismissals for academic and disciplinary reasons.  See id. at 1181-82.  Because Allahverdi's case presents the issue whether his dismissal is academic or disciplinary, rather than academic or discriminatory, Gossett v. Oklahoma ex rel. Bd. of Regents for Langston Univ. does not shed light on the proper resolution of this case.

and for attempting to mislead the committee about the reason for your leaving that program." Wilks December 17 Letter at 1. The First GME Committee outlined conditions that Allahverdi would have to fulfill, including conditions that related to his inappropriate conduct, to continue working at the University. See id. at 1-2; Bachofer February 20 Letter at 1-4. Allahverdi was thus on full alert that the University was not pleased with his performance.

There is no genuine issue that the decision to dismiss Allahverdi was careful and deliberate. The Second Family Practice Committee terminated him after reviewing the charges against him and concluding that they merited dismissal. See Bachofer April 15 Letter at 1-2. The Committee reevaluated its decision a few weeks later and affirmed the dismissal. See McGrew Letter at 1. The Second GME Committee heard Allahverdi's appeal in which Allahverdi was permitted to bring counsel, make a statement, answer questions from and ask questions of the panel members, and present witnesses. See House Officer's Manual at 26; Allahverdi Depo. at 171:19-173:9, 173:21-25. Following the Second GME Committee's holding, the Dean of the University's School of Medicine entertained Allahverdi's appeal and met with Allahverdi to discuss his appeal. See Sears Letter at 1; Bannon Letter at 1. Over the course of eighteen months, then, the Defendants underwent three proceedings to determine the proper course against Allahverdi and based their decision on articulated, concrete grounds. Nothing appears in the record to indicate that the process was arbitrary or capricious. If anything, Allahverdi received more due process than required for an academic dismissal, because he participated in a hearing before the Second GME Committee, even though a hearing is not required for academic dismissals. See Allahverdi Depo. at 167:9-13; Trotter v. Regents of the Univ., 219 F.3d at 1185.

Other than arguing that he is entitled to the due process accorded employees, Allahverdi raises

-43-

objections throughout his briefing and during the hearing to alleged violations of the University's own procedures. See generally Plaintiff's Response; Transcript of Hearing at 16:25-20:6. If, by doing so, Allahverdi means to allege that the University's alleged failure to abide by its own grievance system is, by itself, a violation of due process, then Allahverdi is mistaken. State law establishes only whether a property interest has been created; once state law creates such an interest, then only federal constitutional law determines whether the procedures used to deprive a person of that property interest accorded with due process. See Hulen v. Yates, 322 F.3d at 1247. A violation of due process does not depend on the state statute creating the property interest. See id. Allahverdi may have a state law claim, for violation of his rights, contractual or otherwise, but not a federal constitutional due process claim.

Finally, Allahverdi argues that the manner in which the hearing was conducted – allegedly anonymous accusers, use of unverified documents, secret hearings, and a long interval between filing his appeal and the Second GME Committee's hearing – violated his due process rights. See Plaintiff's Response at 19. Yet the Tenth Circuit has stated that all the process that must be accorded to students undergoing academic dismissals is: (i) prior notice of faculty dissatisfaction with his or her performance and of the possibility of dismissal; and (ii) the decision to dismiss the student must be careful and deliberate. See Trotter v. Regents of the Univ., 219 F.3d at 1185. While Allahverdi contends that the hearing was inadequate, he misses the fact that he was not entitled to a hearing. See id. By giving Allahverdi prior notice and a careful and deliberate decision-making process, the Defendants met the strictures of the Due Process Clause.

In conclusion, there is no genuine issue that Allahverdi is a student, not an employee. Also, there is no genuine issue that Allahverdi was dismissed for academic reasons and that he received the

minimum due process required for an academic dismissal.  In light of the Court's conclusion, it need not reach the issue whether Allahverdi waived his right to procedural due process by agreeing to the zero tolerance reinstatement imposed by the First GME Committee.  The Defendants are therefore entitled to judgment as a matter of law on Allahverdi's procedural due process claim.

## II.      THE COURT WILL REMAND ALLAHVERDI'S REMAINING STATE CLAIMS.

Having dismissed the claim on which the Court had original federal question jurisdiction, the Court, pursuant to 28 U.S.C. § 1367(c)(3), declines to exercise supplemental jurisdiction over the state law claims.  See Pruitt v. Comcast Cable Holdings, LLC, 100 Fed. Appx. 713, 717 (10th Cir. June 3, 2004)(unpublished decision)(holding that the district court's refusal to exercise supplemental jurisdiction over plaintiff's state law contract claims after dismissing all federal claims was "clearly authorized under 28 U.S.C. § 1367(c)(3)").  Under 28 U.S.C. § 1367(a), "in any civil action of which the district courts have original jurisdiction, [a] district court [] shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  A district court, however,

> may decline to exercise supplemental jurisdiction. . . if[:]
>
> (1) the claim raises a novel or complex issue of State law,
>
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
>
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).  The third provision applies to this case.  The Court has dismissed the claim on which it had original jurisdiction -- the procedural due process claim.  The remaining claims sound in state law.

The Supreme Court and the Tenth Circuit have not only acknowledged such a result, they have encouraged it.  In United Mine Workers of America v. Gibbs, 383 U.S. 715 (1966), decided more than twenty years before Congress passed 28 U.S.C. § 1367, the Supreme Court addressed the federal district courts' ability to exercise jurisdiction over state law claims. In explaining that such power existed, the Supreme Court noted that it "need not be exercised in every case in which it is found to exist."  Id. at 726.  The Supreme Court continued:

> Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

Id. (footnotes omitted).  Cf. Bd. of County Comm'rs v. Geringer, 297 F.3d 1108, 1115 n.6 (10th Cir. 2002)("The district court's ruling [in which it declined to review the state law claims] comports with our general admonishment that district courts should dismiss state claims without prejudice after all federal claims have been dismissed, particularly when the federal claims are dismissed before trial. . . .").

The Court has also considered and weighed the values of judicial economy, convenience, fairness, and comity.  In this case, upon the granting of summary judgment to the Defendants on Allahverdi's procedural due process claim, the Court believes that comity suggests that it should remand Allahverdi's remaining claims – for breach of contract, breach of the covenant of good faith and fair dealings, and injunctive relief – to the state court where Allahverdi originally filed them.  The

New Mexico state courts are more experienced and knowledgeable about the contours of state law. Also, federal courts should strive to avoid deciding issues of state law when, as here, it is possible to do so.  The Court also recognizes that Allahverdi filed this case originally in state court and that it was the Defendants who removed this case on the basis of federal question jurisdiction; returning this case to the state court would return it to the forum that Allahverdi selected.  The Court will therefore remand the remaining state claims to state court.

IT IS ORDERED that Defendants' Motion for Summary Judgment is granted in part and denied in part.  The Court grants the Defendants summary judgment on Allahverdi's federal procedural due process claim.  The Court remands the remaining state claims and the remaining case to the Second Judicial District of the State of New Mexico.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Steven K. Sanders
Steven K. Sanders & Associates, L.L.C.
Albuquerque, New Mexico

    *Attorneys for the Plaintiff*


Josh A. Harris
Mark D. Trujillo
Beall & Biehler, An Association
Albuquerque, New Mexico

    *Attorneys for the Defendants*